**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **SASHA BEGUM NORMAN,** | § | |
| **INDIVIDUALLY AND AS NEXT** | § | |
| **FRIEND OF MINOR CHILD S.N.;** | § | |
| **AND SHANE NORMAN,** | § | |
| **INDIVIDUALLY AND AS NEXT** | § | |
| **FRIEND OF MINOR CHILD S.N.;** | § | **SA-19-CV-00494-XR** |
| *Plaintiffs* | § | |
| | § | |
| **-vs-** | § | |
| | § | |
| **BODUM USA, INC.,** | § | |
| *Defendant* | § | |

## <u>ORDER</u>

On this date, the Court considered Defendant Bodum USA, Inc.'s Motion for Summary Judgment (ECF No. 38), Motion to Exclude Testimony of William Lingnell (ECF No. 39), and Motion to Strike Expert Report of William Lingnell and Exclude Any Testimony Derived Therefrom (ECF No. 37). After careful consideration, the Court grants summary judgment in favor of Bodum.

## Background

Plaintiffs Sasha Begum Norman and Shane Norman filed this lawsuit individually and as next friends of their minor child, S.N., after S.N. was injured while using a Bodum Brazil 8-cup French coffee press with his parents' supervision in November 2018. Plaintiffs bought the French press new less than two years before the incident. They used the French press frequently, though not every day, and had permitted S.N. to depress the plunger on prior occasions. On the day of the incident, Shane Norman prepared the coffee grounds, placed them and the hot water into the press, waited four minutes, and then allowed S.N. to press down on the plunger knob, as he had done on previous occasions. The glass carafe fractured, and S.N. was burned by hot water

1

on 13% of his body, including his eyes, face, chest, arms, neck, and shoulder. At the time of incident, S.N. was five years old, and he has suffered permanent scarring.

Plaintiffs' Complaint asserts claims against Bodum for design defect, manufacturing defect, and negligence. The design defect claim alleged that the press did not possess an adequately designed steel coil component in its plunger unit, insofar as the plunger assembly design "did not prevent uncoiling of the steel coil's end-piece, allowing the end-piece to become uncoiled and jut toward the outer portion of the plunger, coming into contact with the glass container during use." Complaint ¶ 4.3. Plaintiffs' Complaint describes the manufacturing defect as follows:

> [T]he plunger unit possessed a steel coil that has two end pieces. These steel ends were wrapped around the adjacent portion of the steel coil. At the time of manufacture, the steel end-piece was not adequately wrapped around the adjacent piece. During use, this end-piece became uncoiled, allowing the steel end-piece to come into contact with the glass container during use.

Complaint ¶ 4.7. Plaintiffs also assert numerous negligence claims, including negligent design, manufacturing, plant operation, and quality control, negligently failing to test, and negligent failure to warn or disclose information and dangers. In their summary judgment response, Plaintiffs concede their design defect claim and focus on their manufacturing defect and negligence claims.

Plaintiffs designated William Lingnell as their liability expert. Lingnell produced an expert report on July 24, 2020, and a supplemental report on November 18, 2020.[1] Lingnell states that "one of the rough-cut ends of the perimeter spring is shaped so that it protrudes from the circular perimeter of the upper support disk." ECF No. 38-1 at 13. He opines, "The position of the rough-cut end is such that it is likely that it contacted and scratched the inner surface of the glass." *Id.* at 13-14. In addition, he notes "a local deformation of the metal mesh in the vicinity of

---

[1] The Supplemental Report includes Lingnell's opinion about Bodum's quality control measures. ECF No. 49-3.

the spring overlap," which "enhances the probability that the rough-cut end of the flexible spring would contact the inner surface of the glass carafe." *Id.* at 14. Lingnell examined an exemplar press, and found that its coil remained within the mesh enclosure and did not protrude.[2]

Lingnell opines that the most probable cause of the failure of the glass carafe was "thermal stress coupled with damage to the inside surface of the glass carafe caused by glass-to-metal contact between the wire mesh and/or the rough-cut edge of the perimeter spring." *Id.* at 14. Lingnell originally described the manufacturing defect only as: "a press mechanism that included a metal perimeter spring and mesh," noting that "[t]he press mechanism, which is in intimate contact with the glass carafe, caused the scratch that led to the glass break." ECF No. 38-1 at 25 (conclusion 16). His original report does not include an opinion as to whether the coil was protruding at the time of manufacture or became uncoiled due to use, as alleged in the Complaint. Nor does it discuss how exactly the subject French press differed from manufacturing specifications or planned output, other than being different from the exemplar.

Bodum contends that the fracture originated on the exterior diameter of the glass carafe, refuting Plaintiffs' manufacturing defect theory of causation, which relies on the existence of a "critical scratch" on the interior of the carafe. Bodum's expert Gabriel Ganot opines that the fracture originated on the outside of the carafe and was caused by local mechanical stresses, "whereby the area of fracture origin was placed in tension perpendicular to the crack propagation direction." ECF No. 38-3 at 6. Bodum contends that Lingnell did not conduct sufficient analysis to establish that the fracture originated on the interior diameter as he hypothesizes. Bodum notes that Lingnell has no evidence that there was a scratch on the interior of the carafe and testified that he did not see a scratch, but Lingnell concluded that it must have been there or the carafe

---

[2] Plaintiffs assert that both Lingnell and Bodum's expert Gabriel Ganot agree that the coil in the Normans' press protrudes outward. ECF No. 49 at 3 n.2 (citing Lingnell Depo. at 281, Ganot Depo. at 49).

would not have broken. Lingnell stated in a supplemental post-motion Declaration that the scratch may have been subsumed within the fracture. Bodum argues that all of Lingnell's testimony is essentially *ipse dixit*, as he cites no studies, publications, or authority, and performed insufficient testing and calculations.

Bodum asserts that Plaintiffs cannot recover on their manufacturing defect claim because (1) they have no evidence of the manufacturing specifications and cannot prove that the condition deviated from those specifications, (2) they have no evidence that the allegedly defective condition of the coil was present when it left Bodum's control, and (3) they have no evidence that the fracture was caused by a scratch resulting from the allegedly defective coil. Bodum contends that the negligence claims fail along with the defect claim, because it cannot be negligent to manufacture or fail to warn about a product that does not have a defect. In two separate motions, Bodum also moves to strike Lingnell's report and testimony because (1) the report was co-authored by Dr. W. Lynn Beason and Dr. Michael Brackin but fails to identify the work each person did, the sections each person wrote, and the opinions each person reached and fails to disclose the extent of each author's reliance (especially Lingnell's) on the other authors and because (2) Lingnell's opinions are factually incorrect, based on untested and unsupported assumptions, and are the result of unreliable methods.

In response, Plaintiffs argue that summary judgment is not warranted on their manufacturing defect and negligence claims. Plaintiffs allege that the French press possessed a manufacturing defect at the time it left the manufacturer in its original packaging, in the form of a protruding coil with a rough-cut end that damaged the interior of the glass carafe, ultimately leading to its fracture. They argue that a French press with a protruding coil was clearly not manufactured as intended by Bodum because the coil end could contact the glass carafe, and it is

"Glass 101" that metal and glass contact should be avoided because it could result in scratching and weakening the carafe.

Lingnell also produced an additional Declaration, in which he, among other things, (1) rebuts Dr. Ganot's opinion that the fracture was caused by a mechanical stress, (2) clarifies that he partially inserted the plunging assembly into the subject carafe and "observed the protruding rough-edge hovering over the lip of the carafe while [he] visually simulated the beginning of the plunging portion of the Bodum French Press coffee making process" and "repeated this process with an exemplar plunging assembly and an exemplar carafe, but this time freely inserting the plunger into the carafe," whereupon he "was able to adequately replicate the exact positioning of the protruding steel edge to the edge of the carafe's lip" and determined that "the steel edge lined up perfectly with the origin of the fracture"; and (3) states the opinion that the subject French press "possessed a manufacturing defect – a protruding rough-cut edge of a coil assembly that was not safely tucked into the coil – that caused damage to the lip of the glass carafe and led to a fracture caused by temperature differential between the carafe's body and lip." ECF No. 47-1.

## Analysis

Summary judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56(c). The moving party bears the initial burden of "informing the Court of the basis of its motion" and identifying those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." *Adams v. Travelers Indem. Co.*, 465 F.3d 156, 163 (5th Cir. 2006). Once the moving party meets this burden, the nonmoving party must "go beyond the pleadings" and designate specific facts in the record showing that there is a

genuine issue for trial. *Id.* at 164. The Court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment, and must review all facts in the light most favorable to the nonmoving party. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009). For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Under Texas law, "[a] manufacturing defect exists when a product deviates, in its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous." *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006). Plaintiffs bear the burden of proving that the product was defective when it left the hands of the manufacturer and that the defect was a producing cause of the plaintiff's injuries. *Id.* Texas law requires expert testimony and objective proof to support a jury finding that a product defect caused injury. *Gharda USA, Inc. v. Control Solutions, Inc.*, 464 S.W.3d 338, 348 (Tex. 2015).

To prove a manufacturing defect under Texas law, a specific defect must be identified by competent evidence and other possible causes must be ruled out. *Id.* at 352; *Casey v. Toyota Motor Eng'ng & Mfg. N. Am., Inc.*, 770 F.3d 322, 326 (5th Cir. 2014). Texas law does not generally recognize a product failure or malfunction, standing alone, as sufficient proof of a product defect. *Casey*, 770 F.3d at 326. Rather, the deviation from design that caused the injury must be identified so that the jury is not invited to find liability based on speculation as to the cause of the incident in issue. *Id.* Further, Texas does not permit proof of a manufacturing defect by showing a deviation from performance standards alone. *Id.* at 328.

6

Bodum asserts that Plaintiffs cannot recover on their manufacturing defect claim because (1) they have no evidence of the manufacturing specifications and cannot prove that the condition deviated, in construction or quality, from those specifications, (2) they have no evidence that the allegedly defective condition of the coil was present when it left Bodum's control, and (3) they have no evidence that the fracture was caused by a scratch resulting from the allegedly defective coil. The Court agrees that Plaintiffs have proffered insufficient evidence that the subject coil assembly deviated, in construction or quality, from manufacturing specifications or planned output in a manner that renders it unreasonably dangerous.

### A. Plaintiffs fail to provide sufficient evidence that the product deviates, in its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous

A manufacturing defect exists when a product deviates, in its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous. Bodum argues that Plaintiffs cannot establish the press deviated from its manufacturing specifications because they possess no evidence of the press's manufacturing specifications or that the press deviated from those specifications. Bodum cites to *Casey v. Toyota Motor Engineering & Manufacturing North America, Inc.*, 770 F.3d 322, 328 (5th Cir. 2014) and *iLight Techs. Inc. v. Clutch City Sports & Entm't L.P.*, 414 S.W.3d 842, 848 (Tex. App.—Houston [1st Dist.] 2013, pet. denied), in support of its position that Plaintiffs lack sufficient evidence concerning the press's manufacturing specifications.

In *Casey*, the Fifth Circuit rejected the argument that a plaintiff could establish a manufacturing defect by showing deviation from performance standards. In its opinion, the Fifth Circuit noted that specifications for the purposes of a manufacturing defect contain design details and are not simply statements about the result or expected performance. *Casey*, 770 F.3d at 328

n.6. Manufacturing defect cases involve products that are flawed, *i.e.*, that do not conform to the manufacturer's own specifications, and are not identical to their mass-produced siblings. *Casey*, 770 F.3d at 329. The flaw theory is based upon a fundamental consumer expectancy: that a mass-produced product will not differ from its siblings in a manner that makes it more dangerous than the others. *Id.* Unlike a design defect claim, a touchstone of a manufacturing defect claim is proof that the allegedly defective product differs from other products in the same product line. *Id.* ("Casey must show that the airbag in this case differs from the airbags that Toyota produced in the same time period and installed in other Highlander vehicles.").

In addition, the First Court of Appeals in *iLight* stated, "it is a matter of logic that to demonstrate how a product deviated from its specifications or planned output would first require a showing of what the manufacturer's specifications or planned output are for that product." 414 S.W.3d at 848. In that case, the plaintiff's expert did not testify regarding what the product specifications required and testified that he did not have access to the plans or specifications for the product. *Id.* The court noted, "Even presuming that iLight had no express design specifications for the soldering, no evidence showed whether the supply wire had been soldered in a manner or in a configuration unintended by iLight. Shade [the plaintiff's expert] gave no testimony indicating why he characterized the solder attaching the supply wire as 'excess' solder. Shade did not explain whether he believed that the product specifications called for what he termed 'excess' solder or whether the solder used was in excess to what iLight had intended or planned when the product was manufactured." *Id.*

Plaintiffs acknowledge that they do not have manufacturing specifications for the French press, but note that the Texas Supreme Court has repeatedly listed the requirement as deviation from the specifications *or planned output*, thus making clear that proof of the manufacturing

specifications is not required.[3] Plaintiffs argue that the press assembly with a protruding coil must have deviated from planned output because the exemplar press did not have a protruding coil, and it is "Glass 101" that one does not intend for glass and metal to touch.

Plaintiffs contend that *Casey* is distinguishable because the plaintiff did not identify a defect and presented no evidence of deviation from intended design or planned output. Plaintiffs also contend that *iLight* supports their position, as the court confirmed that deviation from intended design may be shown by circumstantial evidence separate and apart from express design specifications.

Plaintiffs contend that their evidence is sufficient to show that the subject component was not manufactured in accordance with its planned output or design, given that it is "almost axiomatic" that "metal-to-glass contact is avoided at almost all costs." ECF No. 49 at 15. Plaintiffs cite to the following evidence: (1) the exemplar press mechanism examined by Lingnell did not have a protruding cut coil, while the subject mechanism did; (2) Bodum's CEO Himmelstrup admitted that an unfurled steel edge could be a manufacturing defect; (3) the instruction manual includes five depictions of the intended design of the press mechanism, none of which include a protruding coil (Ex. F-1); (4) the owner's manual contains six such depictions, none of them exhibiting a protruding coil (Ex. H); and (5) the design patent confirms that the product was not designed to have a protruding coil that could potentially escape its mesh enclosure and scratch or damage the glass, as it shows the end of the spring coil not protruding, and the protective mesh separating the coil from the glass.

Plaintiffs argue that they have satisfied their burden to show deviation from planned output. Plaintiffs contend that Lingnell examined the exemplar and subject coils and mesh and

---

[3] Plaintiffs state they requested specifications in written discovery, but "Bodum has produced nothing more than a glass specification sheet." ECF No. 49 at n.9. Of note, Bodum asserts it is not the manufacturer of the French press.

concluded that the subject press was not manufactured consistent with its planned output. Plaintiffs proffer the post-motion Declaration from Lingnell stating that the coil on the subject press differed from the exemplars used by himself and by Dr. Ganot, both of which had no protruding coil edge escaping the wire mesh and had the wire mesh separating the entire steel coil from the glass beaker. ECF No. 49-5. He notes that the drawing of the press in the literature "depicts the wire coil laced into the base plate; no edge piece is shown protruding outside the coil chamber." Lingnell states that "[t]he exemplars used by myself and Dr. Ganot, as well as the unit's instruction manual, demonstrate the intended design and planned output of the plunger assembly: a wire edge-piece, housed inside a coil chamber and separated from the glass by a mesh enclosure, averting contact between the edge of the coil and glass." *Id.* He concludes, "The subject product's plunger assembly possessed a sharp protruding edge-piece that escaped its coil chamber and its mesh enclosure, creating metal to glass contact. The subject French press was not manufactured consistent with its planned output." *Id.*

The fact that the subject plunger assembly in this case differed from the exemplar purchased for purposes of the litigation (and also one examined by Ganot) does not establish a manufacturing defect. As noted, Plaintiffs asserted a manufacturing defect claim in their Complaint that alleged only that the edge of the coil was "not adequately wrapped around the adjacent piece," and that the coil became uncoiled "during use." Compl. ¶ 4.7. Even setting that aside and assuming the defect was a protruding coil at the time of manufacture, as Plaintiffs now contend, the fact that the subject coil assembly (the coil wrapped around a disk) purchased in 2016 differs from two coil assemblies purchased in 2019 does not mean that the coil assembly purchased in 2016 contains a manufacturing defect. *See Casey*, 770 F.3d at 329 ("Casey must show that the airbag in this case differs from the airbags that Toyota produced in the same time

period and installed in other Highlander vehicles."). This is simply too small a sample from which to infer that the protruding coil was not also present on other coil assemblies produced in the same time period.

This is especially true given the fact that, as Plaintiffs themselves point out, the coil assemblies advertised for sale on Bodum's website contain a protruding coil. ECF No. 49 at 7. Unlike the stylized images of the coil assembly contained in the warnings and instruction manual, the website contains a picture of an actual coil assembly. The fact that the coil assembly advertised for sale has a protruding coil indicates that other assemblies are in fact manufactured in the same way as Plaintiffs'. Moreover, the fact that the coil assembly is advertised for sale this way is strong evidence that Bodum does not view it as defective, but rather in accordance with planned output.

Plaintiffs point to this evidence to prove that the alleged defect was there when it left Bodum's control, but it undermines Plaintiffs' claim that the defect is in fact a defect. Plaintiffs admit that "some of the press mechanisms being sold by Bodum to this day are defectively manufactured such that the rough-cut end of the spring coil protrudes dangerously outward, as opposed to being tucked back toward the coil." ECF No. 49 at 7. Plaintiffs also admit that "Bodum was additionally aware of the fact that its press mechanism was being *routinely manufactured* with the protruding coil defect." ECF No. 49 at 25 (emphasis added). Despite these acknowledgements, Plaintiffs simply presume that these coils are not manufactured in accordance with planned output because metal can scratch glass. But the only evidence before the Court is that two coil assemblies had a protruding coil (the subject press and one advertised for sale by Bodum) and the exemplars purchased and examined by Lingnell and Ganot did not. This is not evidence that the protruding coil in the subject assembly differed in kind from most of

11

the coils manufactured at the same time, or that it differed from manufacturer specifications or planned outcome. It is just evidence that some coil assemblies have a protruding coil end and some do not. And because Bodum is advertising for sale the coil assembly with the protruding coil end, it would appear that Bodum does not in fact view the assembly with the protruding coil as defective or a deviation from specifications or planned output.

Plaintiffs' reliance on Himmelstrup's deposition testimony, quoted below, is misplaced:

Q. Do you know why this glass [glass in another case] failed?

A. No.

Q. The Cox glass?

A. No.

Q. Is it possible that it failed from a manufacturing defect?

A. I have no reason to believe that.

Q. It's possible, isn't it?

MR. WHEELER: Objection; form.

A. I said I have no reason to believe that

Q. You have no reason to think it's not possible, right?

MR. WHEELER: Objection to form

Q. You don't know one way or the other? Isn't that fair?

A. What—what—what do you—can you define—what do you mean by—

Q. You don't –

A. What do you mean by manufacturing error?

Q. Well, say a steel wire was unfurled prior to shipping a product to my client, that could be a manufacturing problem, right?

MR. WHEELER: Objection; form.

A. I agree that could be a manufacturing situation.

Q. Yeah, in that situation, do you think it's possible that's what failed with the Cox glass?

A. No.

ECF No. 49-16 (Ex. N)  79:9-80:12. Hypothesizing that "a steel wire was unfurled" is vague, and does not ask whether the protruding coil in the current case was a manufacturing defect unintended by Bodum. Bodum correctly argues that "Mr. Himmelstrup's equivocal statement, in response to a hypothetical question, does not establish that the design of the French Press required all of the spring ends to be tightly coiled so as not to protrude even slightly, and that thus any protrusion of a spring end represents a defect from intended production." Mr. Himmelstrup was not asked whether the specific protrusion on the subject French Press represented a manufacturing defect. He likewise did not testify that an unfurled coil, no matter how unfurled, is a manufacturing defect. Himmelstrup was not asked whether the subject coil or the coil depicted for sale with the protruding end were defective or deviated from specifications or planned output. His testimony does not permit a jury to draw a reasonable inference that the specific coil in this case was a deviation from planned output.

Plaintiffs argue that an instruction or owner's manual like the one Bodum produced, which shows multiple drawings of the press mechanism without a protruding coil, can provide evidence necessary to establish a fact issue as to whether the product deviated from planned output. ECF No. 49 at 19 (citing cases). Bodum argues that Plaintiffs' unlabeled pictures are not probative of the manufacturing specifications for the filter assembly. ECF No. 55 at 2. Bodum asserts that these documents and pictures are contained in the product's warnings and instructions and are solely provided for that purpose, and there is "no evidence that these

photographs reflect in any degree of detail the precise manufacturing specifications of the French Press, and they certainly provide no information assigning any significance to the allowable or intended coiling of the spring on the press." *Id*. at 3.

Bodum argues that the patent picture on its face states it is a supporting document for an "ornamental design" claim, meaning it would not cover function or other technical aspects like the precise positioning of the coil ends or their interaction with the glass. *Id*. at 3-4 (citing *Sada v. Jack In The Box, Inc*., No. SA-04-CA-541-OG, 2006 WL 6209916, at *4 (W.D. Tex. Feb. 15, 2006) ("Defendant correctly notes that a design patent only protects the non-functional, ornamental features of the claimed design; thus, the Court's construction analysis should exclude any functional aspects of the design."). Bodum states, "A patent covering non-functional, ornamental features of this coffee-maker design provides no information as to the functional design elements and how they work together." ECF No. 55 at 4.

The Court agrees that these items relied upon by Plaintiffs present only stylized pictures of the coil assembly and lack any description from the manufacturer suggesting that the precise position of the coil end is critical to proper output. The Court further agrees that Plaintiffs' cited cases do not help them.

Plaintiffs cite *Miles v. Ford Motor Co*., No. 05-99-01258-CV, 2001 WL 727355 (Tex. App.—Dallas June 29, 2001, pet. denied), in which the court found sufficient evidence of a manufacturing defect when a seatbelt tension eliminator did not permit the belt to retract as intended. The plaintiff relied on a statement in the owner's manual and the testimony of Ford's witness to show that the tension eliminator was supposed to automatically reset to a tight position after a person leans forward and moves around or when the door is opened. The *Miles* court stated that if a plaintiff has no direct evidence of a manufacturing defect, he may offer

evidence of the product's malfunction as circumstantial proof of the defect, and the malfunction may be established by testimony from the product's user. This is contrary to the Fifth Circuit's later opinion in *Casey*, which explicitly held that "Texas law does not generally recognize a product failure or malfunction, standing alone, as sufficient proof of a product defect." *Casey*, 770 F.3d at 326. In *Miles*, the Fifth Court of Appeals found sufficient statements in the owner's manual and the testimony of witnesses that the seatbelt tension eliminator was supposed to allow the seatbelt to retract, but it did not. This is merely evidence that the tensioner did not perform as intended (*i.e.*, it malfunctioned), not that it was manufactured with a deviation in construction or quality from the specifications or planned output. Moreover, as Bodum points out, the plaintiffs in *Miles* also had testimony from a manufacturer witness about how the seatbelt was *supposed to* operate. There is no comparable testimony in this case because there is no testimony establishing exactly how the ends of the coil should be positioned or that the coil end on the subject assembly was positioned in an unacceptable manner.

In *Garcia v. Wheelabrator Group, Inc.*, No. 3:10-CV-1253-P, 2011 WL 13232701 (N.D. Tex. Nov. 3, 2011), the alleged "manufacturing defect" was that a silencer assembly was not delivered along with a dust recovery unit, so the dispute on summary judgment was whether the part was shipped or whether it was missing. There was no dispute about whether inclusion of the silencer was part of the intended output. The product manual is discussed only in regard to whether the missing silencer was the producing cause of the plaintiff's injury. Thus, this case is not relevant.

Plaintiffs also cite *Weams v. FCA US L.L.C.*, No. CV 17-4-RLB, 2019 WL 960159 (M.D. La. Feb. 27, 2019), *motion to certify appeal denied*, No. CV 17-4-RLB, 2019 WL 3812222 (M.D. La. July 9, 2019) and *appeal dismissed*, No. 19-30242, 2019 WL 4673560 (5th Cir. Aug.

9, 2019), a case in which an airbag spontaneously deployed and injured the plaintiff. *Weams* applies Louisiana law, not Texas law. Under the Louisiana Products Liability Act, "[a] product is unreasonably dangerous in construction or composition if, at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer." La. R.S. 9:2800.55. Thus, unlike Texas law, Louisiana law allows a deviation from performance standards to establish a manufacturing defect.

And in *Weams*, the plaintiff offered portions of the vehicle's owner's manual to establish performance standards with respect to the failure of the SRS warning lamp. The court did state that, generally, "[a]n operating or instruction manual can establish the requisite manufacturer's specifications or performance standards." *Weams*, 2019 WL 960159, at *21. But that does not mean that information in all operating or instruction manuals will suffice to establish specifications or planned output to establish a manufacturing defect. And the cases relied upon by the *Weams* court where a manual was used to prove performance standards are contrary to Texas law, which does not permit a plaintiff to rely on deviation from performance standards to establish a manufacturing defect. Moreover, the Court agrees with Bodum that the stylized pictures in the manuals and ornamental patent do not show that any protrusion would be considered an unacceptable or unintended variation from planned output in the manufacturer's view.

Plaintiffs fail to offer sufficient evidence of the manufacturer's intended specifications or planned output with regard to the position of the coil ends to make a submissible case on their manufacturing defect claim. Instead, Plaintiffs essentially argue that the manufacturer must not have intended to manufacture the coil with the protruding end because it is "Glass 101" that

16

metal can scratch glass. But as Bodum points out, the press itself is designed so that the metal mesh comes into contact with the glass at all times (and Lingnell has opined that either the coil end or the mesh caused the "critical scratch"). Further, the metal mesh is intended to engulf the coil so that the coil does not come into contact with the glass. As a result, it is not clear that the manufacturer would care whether the spring's coil end protrudes to some degree, as long as it does not interfere with the functioning of the plunger. Although Plaintiffs contend that Bodum must have intended the ends to be "tucked in," they simultaneously point to Bodum's own website in which the coil assembly on display for sale contains a "protruding coil"—the same protrusion that they conclude is defective and could not be intended by Bodum. But as discussed previously, this is strong evidence that such a protrusion would not be viewed by Bodum as a deviation from intended output at all. In that case, it is at most a design defect, but Plaintiffs have effectively abandoned their design defect claim and have presented no evidence of a safer alternative design.

Lingnell's new Declaration describing the alleged manufacturing defect for the first time as the protruding coil does not save Plaintiffs, as it relies on the same evidence discussed above, which is insufficient to go to a jury on the issue. Moreover, as pointed out by Bodum, Lingnell himself testified that he observed the coil end touch the glass without damaging it, Lingnell Depo. at 264:6-265:16, though he later stated he did not make contact between the coil end and the glass.[4] Bodum also points out that the design of the French Press is such that the metal mesh

---

[4] The deposition testimony is:

> Q. It is my understanding that you testified a moment ago that you were able to achieve metal-on-glass contact from that rough edge of the spring by taking the plunger assembly from the subject matter French press and inserting it into a glass carafe.
> A. Yes.
> Q. Do I – okay. When that happened, did you observe any damage?
> A. I didn't at the time that we did that no.
> Q. Okay. How many times did you observe that phenomenon of contact during the insertion of the assembly into the beaker?

touches the glass walls of the carafe at all times, and thus metal-to-glass contact is not always an automatic defect. *See* Lingnell Depo. at 253:6-17.[5] Further, the metal mesh was intended to completely engulf the metal coil, and thus some coil end protrusion could be within manufacturing specifications.

As noted by Bodum, "Warnings to be careful using metal tools in a glass beaker do not provide circumstantial evidence that the Press assembly did not have a range of design tolerances for certain spring ends to protrude slightly." ECF No. 55 at 11. Plaintiffs' evidence simply fails to allow a jury to infer that the coil protrusion in the subject coil assembly, even if present at manufacture, would be considered a failure to meet planned output or specifications. Therefore, summary judgment is appropriate on this element of Plaintiffs' manufacturing defect claim.

### B. Plaintiffs' negligence claims fail because there is no evidence of a defect

Plaintiffs also assert numerous negligence claims, including negligent design, manufacturing, plant operation, and quality control, negligently failing to test, and negligent failure to warn or disclose information and dangers. As stated by Plaintiffs, "the bulk of Plaintiffs' negligence claims stem from the manner in which Bodum operated the plant where the French Press was manufactured, the fact that it did not install sufficient quality control procedures so as to prevent the kind of poor quality production and inspection that resulted in Plaintiffs' injuries, the fact that it negligently concealed known dangers associated with the

---

A. I don't know the exact number. We worked it back and forth. We knew that it could hit the rim of the glass in the exemplar, and we did it enough times to know that that could happen."

Lingnell also stated "I did" when asked "Did you actually observe that the rough end of the flexible spring made contact with the glass directly? Did you observe that yourself?" Lingnell Depo. at 249. In his post-motion Declaration, Lingnell states contradictorily that he inserted the subject plunging assembly "without touching the subject carafe." ECF No. 47-1 at ¶ 10. However, there is no evidence that Lingnell ever touched the coil end to the carafe and caused any damage to the carafe.

[5] Q. So there's always going to be contact between that wire metal mesh and the side of the glass, the interior surface of the carafe, every time.
A. Likely, yes.

French Press and failed to disclose post-sale information about the product's known defects and dangers." ECF No. 49 at 25.

Although Plaintiffs contend that Bodum did not move for summary judgment on some of Plaintiffs' negligence claims, Bodum clearly moved for summary judgment on all negligence claims. Even assuming that Bodum manufactured or designed the French press, which Bodum disputes, Bodum moves for summary judgment because, without evidence of a defect, it cannot be held liable for negligence related to manufacturing or designing the product. Bodum further moves to dismiss on any failure to warn claim because there is no evidence that Bodum knew of the risk associated with the specific manufacturing defect Plaintiffs contend caused their injuries and because Plaintiffs have not presented a necessary warnings expert.

The Court has found insufficient evidence of a manufacturing defect as a matter of law, and summary judgment is appropriate on Plaintiffs' design defect claim, and thus Plaintiffs' negligence claims related to design and manufacturing also fail for lack of a design or manufacturing defect. *Garrett v. Hamilton Standard Controls, Inc.*, 850 F.2d 253 (5th Cir. 1988) ("a manufacturer logically cannot be held liable for failing to exercise ordinary care when producing a product that is not defective," and the rejection of strict liability claim precludes a negligence claim); *Ramirez v. Michelin N. Am., Inc.*, SA-07-CA-1032-OG, 2010 WL 11506739, at *2 (W.D. Tex. Feb. 18, 2010). The Court further agrees that there is no evidence that Bodum was aware of any risk associated with the coil assembly. Even if Bodum was aware of the protruding coil, there is no evidence that it viewed the protruding coil as a defect or as potentially dangerous. Himmelstrup testified that he had never seen a complaint about the end of the steel coil contacting the glass carafe, and there is no evidence that this occurred in any other case or that Bodum was aware of it, if it had. In addition, Plaintiffs have not presented evidence from a

warnings expert or shown that the warnings were inadequate. Summary judgment is warranted on Plaintiffs' negligence claims.

**Conclusion**

Bodum's Motion for Summary Judgment (ECF No. 38) is GRANTED. Bodum's other motions (ECF Nos. 37 and 39) are DISMISSED AS MOOT.

The Clerk shall enter a Judgment that Plaintiffs shall take nothing by their claims and that their claims are dismissed with prejudice.

SIGNED this 4th of June, 2021.

_____

Xavier Rodriguez
United States District Judge